# UNITED STATES DISTRICT COURT
for the
Eastern District of California

**SEALED**

FILED

**Aug 19, 2024**

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| United States of America | ) |
| v. | ) |
| JAMAR JONES,<br>STEPHANIE FERREIRA,<br>JERMEN RUDD III | )<br>)<br>) |
| | ) |
| | ) |
| _____ | ) |
| *Defendant(s)* | |

Case No. 1:24-mj-00095-SKO

## CRIMINAL COMPLAINT BY RELIABLE ELECTRONIC OR TELEPHONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of ___July 15, 2024 to August 9, 2024___ in the county of ___Merced___ in the
___Eastern___ District of ___California___, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 USC 841, 846 | Conspiracy to Distribute and Distribution of a Controlled Substance |
| 18 USC 1791(a)(2), (b)(1) | Inmate Obtaining or Attempting to Obtain Narcotic Drug (Jones) |
| 18 USC 1791(a)(1), (b)(1) | Providing or Attempting to Provide Inmate Narcotic Drug (Ferreira, Rudd) |
| | See attached sheet for penalties |

This criminal complaint is based on these facts:

See affidavit, incorporated herein.

☑ Continued on the attached sheet.

_____
*Complainant's signature*

Nate Blevins, FBI Special Agent
*Printed name and title*

Attested to by the applicant in accordance
with the requirements of Fed. R. Crim. P.
4.1 by telephone

_____
*Judge's signature*

Date: ___08/18/2024___

City and state: ___Fresno, CA___          Hon. Sheila K. Oberto, U.S. Magistrate Judge
*Printed name and title*

## United States v. JAMAR JONES, et al.
### Penalties for Criminal Complaint

### JAMAR JONES

**COUNT 1:**

VIOLATION:          21 USC § 841(a)(1), 846
                    Conspiracy to Distribute and Distribution of a Controlled Substance,
                    to wit Methamphetamine, "Spice", and Fentanyl
                    with prior felony drug conviction

PENALTIES:          Maximum of 30 years in prison,
                    Fine of up to $250,000; or both fine and imprisonment
                    6 years to life on supervised release

SPECIAL ASSESSMENT: $100 (mandatory)

**COUNT 2:**

VIOLATION:          18 USC § 1791(a)(2), (b)(1)
                    Inmate Obtaining or Attempting to Obtain Narcotic Drug

PENALTIES:          Maximum of 20 years in prison,
                    Fine of up to $250,000; or both fine and imprisonment
                    3 years supervised release

SPECIAL ASSESSMENT: $100 (mandatory)

## STEPHANIE FERREIRA

### COUNT 1:

VIOLATION:      21 USC § 841(a)(1), 846
                Conspiracy to Distribute and Distribution of a Controlled Substance,
                to wit Methamphetamine, "Spice", and Fentanyl

PENALTIES:      Maximum of 20 years in prison,
                Fine of up to $250,000; or both fine and imprisonment
                3 years to life on supervised release

SPECIAL ASSESSMENT: $100 (mandatory)

### COUNT 3:

VIOLATION:      18 USC § 1791(a)(2), (b)(1)
                Providing or Attempting to Provide Inmate with Narcotic Drug

PENALTIES:      Maximum of 20 years in prison,
                Fine of up to $250,000; or both fine and imprisonment
                3 years supervised release

SPECIAL ASSESSMENT: $100 (mandatory)

## JERMEN RUDD III

**COUNT 1:**

VIOLATION:         21 USC § 841(a)(1), 846
                   Conspiracy to Distribute and Distribution of a Controlled Substance,
                   to wit Methamphetamine, "Spice", and Fentanyl
                   with prior felony drug conviction

PENALTIES:         Maximum of 30 years in prison,
                   Fine of up to $250,000; or both fine and imprisonment
                   6 years to life on supervised release

SPECIAL ASSESSMENT: $100 (mandatory)

**COUNT 3:**

VIOLATION:         18 USC § 1791(a)(2), (b)(1)
                   Providing or Attempting to Provide Inmate with Narcotic Drug

PENALTIES:         Maximum of 20 years in prison,
                   Fine of up to $250,000; or both fine and imprisonment
                   3 years supervised release

SPECIAL ASSESSMENT: $100 (mandatory)

1 PHILLIP A. TALBERT
United States Attorney
2 ROBERT VENEMAN-HUGHES
Assistant United States Attorney
3 2500 Tulare Street, Suite 4401
Fresno, CA 93721
4 Telephone: (559) 497-4000
Facsimile:  (559) 497-4099
5

6 Attorneys for Plaintiff
United States of America

7                    IN THE UNITED STATES DISTRICT COURT

8                    EASTERN DISTRICT OF CALIFORNIA

9

10 UNITED STATES OF AMERICA,                    CASE NO.

11                           Plaintiff,         AFFIDAVIT IN SUPPORT OF COMPLAINT

12                                              **FILED UNDER SEAL**

13                    v.

14
(1)   JAMAR JONES
15 (2)   STEPHANIE FERREIRA
(3)   JERMEN RUDD III
16

17                    Defendants.

18

19                      **TABLE OF CONTENTS**

20 I.     INTRODUCTION AND AGENT BACKGROUND ............................................................2

21        A.     Purpose of Affidavit..........................................................................................2

22        B.     Agent Experience..............................................................................................3

23 II.    SUMMARY OF PROBABLE CAUSE ....................................................................................6

24 III.   DEFENDANTS ..........................................................................................................................7

25 IV.    PROBABLE CAUSE ...............................................................................................................9

26        A.     M.F. handles "legal mail" saturated with narcotics, becomes ill, and dies.......................9

27        B.     JONES and FERREIRA discuss smuggling drugs into a prison on July 13,
                 2024....................................................................................................................10

28

C.     JONES and FERREIRA again discuss smuggling drugs into prison; JONES then receives a piece of "legal mail." ...................................................................14

D.     The day after JONES receives "legal mail," he and FERREIRA discuss receiving narcotics, as well as payment and future shipments involving RUDD. ...................................................................17

E.     JONES and FERREIRA plan another mailing of narcotics in early August 2024. ...................................................................18

F.     U.S. Postal Service records indicate that RUDD collaborated with FERREIRA to mail the August 9 "legal mail" package to JONES ...........................................19

G.     JONES, after seeing the August 9 "legal mail," tells FERREIRA something was wrong with it...........................................20

H.     Surveillance video and photographs confirm that RUDD mailed the narcotics-laced August 9 "legal mail" package to USP Atwater as well as the earlier "legal mail" package. ...................................................................21

I.     License Plate Reader data further indicates that RUDD mailed both "legal mail" packages to USP Atwater...........................................22

J.     RUDD mailed another narcotics-laced letter on August 15, 2024 to a different address, further evidence of his knowledge of the contents of these letters ...........................23

V.     REQUEST FOR SEALING...........................................................................24

VI.     CONCLUSION...........................................................................25

I, Nathan Blevins, being first duly sworn under oath, depose and say:

## I.     INTRODUCTION AND AGENT BACKGROUND

### A.     Purpose of Affidavit

1.     I make this Affidavit to support of a complaint charging:

a)     **Jamar JONES** (**JONES**) with conspiracy to distribute and possess with intent to distribute controlled substances, in violation of Title 21, United States Code, Sections 846 and 841(a); and any inmate of a federal prison who obtains or attempts to obtain any narcotic drug in violation of Title 18, United States Code, Sections 1791(a)(2), (b)(1).

b)     **Stephanie FERREIRA** (**FERREIRA**) with conspiracy to distribute and possess with intent to distribute controlled substances, in violation of Title 21, United States Code, Sections 846 and 841(a); and whoever provides to an inmate of a prison a narcotic drug, or attempts to do so in violation of Title 18, United States Code, Sections

1791(a)(1), (b)(1).

c)    **Jermen RUDD III (RUDD)** with conspiracy to distribute and possess with intent to distribute controlled substances, in violation of Title 21, United States Code, Sections 846 and 841(a); and whoever provides to an inmate of a prison a narcotic drug, or attempts to do so in violation of Title 18, United States Code, Sections 1791(a)(1), (b)(1).

**B.    Agent Experience**

2.    I am a "Federal law enforcement officer" within the meaning of Rule 41(a)(2)(C) of the Federal Rules of Criminal Procedure, that is, a federal law enforcement agent engaged in enforcing criminal laws and authorized to request a search warrant.

3.    I am a Special Agent with the Federal Bureau of Investigation (FBI) and have been employed with the FBI since January 2019.  I have successfully completed the 20-week FBI Basic Field Training Course in Quantico, Virginia.  During my time at the FBI Academy, I received training in a variety of investigative and legal matters, including the topics of Fourth Amendment searches, the drafting of search warrant and complaint affidavits, and probable cause.  Additionally, I received forty hours of Cyber-Crime training, which included training on cellular devices.  I have also attended multiple trainings and conferences specific to investigating gangs and narcotics trafficking organizations.

4.    I possess a Bachelor of Science degree in Law Enforcement from Metropolitan State University.  Prior to my career with the FBI, I served in the United States Marine Corps as a Military Police Officer and Accident Investigator.  I was also the owner/operator of a private investigation firm that specialized in surveillance and investigations of insurance fraud for 15 years.  Throughout my career, I have attended trainings and worked with various law enforcement agencies to investigate and successfully close a variety of cases.

5.    I am currently assigned to the Federal Bureau of Investigation (FBI) Sacramento Division – Fresno Resident Agency, as a member of the Violent Crime Squad and the Safe Streets Task Force.  In

that capacity, I investigate violations of the United States Code as defined in Title 18 and Title 21, United States Code, and Title 28, of the Federal Code of Regulations. I have been specifically been assigned to investigate organizations trafficking in controlled substances. I have personally investigated and/or assisted other agents and officers in their investigations involving violations of Title 21, United States Code, Section 841(a)(1), the manufacture of, distribution of and possession with intent to distribute controlled substances; and Title 21, United States Code, Section 846, conspiracy to commit the foregoing. Specifically, those investigations have focused on the distribution of methamphetamine, heroin, cocaine, fentanyl, and other illicit drugs.

6.     Since approximately May of 2020, I have had a collateral duty assignment with the Merced Area Gang and Narcotics Enforcement Team (MAGNET) where I have received additional training and experience in surveillance, drafting and executing search warrants, and conducting investigations related to gang and narcotics crimes.

7.     In addition to my focus on investigations involving the distribution of narcotics, I was assigned as the FBI liaison to the United States Penitentiary (USP) Atwater for approximately three years. Throughout that time, I conducted multiple investigations involving the introduction of narcotics into the prison facility, and I am familiar with the various ways and means that inmates solicit and obtain narcotics from individuals outside of the prison system and introduce them into the inmate population.

8.     Through my above-referenced training and experience, I am familiar with the identification of various controlled substances. I am also familiar with the various methods used by individuals to obtain, possess, transport, and/or sell controlled substances. I am also familiar with the modus operandi as it pertains to the illegitimate use of such proceeds in violation of federal law. These methods include the use of telephones, cellular telephones, wireless communication technology, counter surveillance, elaborately planned smuggling schemes tied to legitimate businesses, false or fictitious

identities, and the use of coded or vague communications in a phone call or text message format in an attempt to thwart law enforcement.  I have also interviewed controlled substance distributors, narcotic users, and confidential sources and have discussed with them the lifestyle, appearances, habits and methods of controlled substance distribution and trends.

9.      I have also become familiar with the way drug traffickers use telephones, often cellular phones, to conduct their illegal operations. Specifically, I know that drug traffickers use cellular phones to facilitate their criminal activities. In my experience conducting drug investigations, I have found phones to be used for verbal conversations, text messaging, or other instant messaging to conduct drug trafficking activities. Through my training, experience, and interaction with other experienced special agents, task force officers, and other drug investigators, I have become familiar with the methods deployed by drug traffickers to smuggle, safeguard, store, transports, and distribute controlled substances, and to collect and conceal drug related proceeds, and to communicate with other participants to accomplish such objectives.

10.     I have personally participated in the investigation set forth below.  I am familiar with the facts and circumstances of the investigation through my personal participation; from discussions with other agents of the FBI and other law enforcement officers; and from my review of records and reports relating to the investigation.  I have also listened to numerous prison phone calls, and read multiple prison communications, specific to this case.

11.     I am familiar with the methods, language, structures, and criminal activities of street and prison gangs operating in and through this judicial district.  I am familiar with street and leadership level extortion collection activities of these gangs.  I am familiar with the types and amount of profits made by narcotics smugglers and the methods, language, and terms which are used to disguise the source and nature of the profits from their illegal narcotic dealings. I have previously participated in investigations, which utilized Ping and Pen Register / Trap and Trace information, and I am familiar with investigative

methods used in conjunction with these methods. I know from my training, experience, and the current investigation, that prison gangs and drug trafficking organizations (DTOs) utilize cellular telephones and social media for communication within their associates in order to organize and plan the gang's / DTO's criminal activities, including but not limited to assaults, violence, and drug sales.

12.     Unless otherwise noted, wherever in this affidavit I assert that a statement was made, the information was provided by another agent, law enforcement officer or witness who may have had either direct or hearsay knowledge of that statement and to whom I or others have spoken or whose reports I have read and reviewed. Such statements are among many statements made by others and are stated in substance and in part unless otherwise indicated. Since this affidavit is being submitted for the limited purpose of filing a search warrant for the below-mentioned criminal offenses, I have not included details of every aspect of the investigation. Facts not set forth herein are not being relied on in supporting probable cause for the search warrant. Nor do I request that this Court rely on any facts not set forth herein in reviewing this application.

13.     Because this Affidavit is being submitted for the limited purpose of securing complaints for the named subjects, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe establish probable cause that evidence of the violations further described above in paragraph 1 have been committed.

## II.     SUMMARY OF PROBABLE CAUSE

14.     On July 15, 2024, Jamar **JONES** called Stephanie **FERREIRA**. **JONES** is an inmate at the United States Penitentiary, Atwater, and **FERREIRA** is his romantic partner who is not incarcerated. **JONES**, using coded language in a recorded prison call, instructed **FERREIRA** to contact Jerman **RUDD**, aka "Jay", to send narcotics-laced mail to the prison for **JONES** to resell.

15.     On July 19, 2024, **RUDD** was observed on surveillance cameras and identified via his driver's license and other photos going to a post office in Wentzville, MO, and sending a letter to **JONES** via certified mail. United States Postal Service (USPS) records **RUDD** labeled the letter with the return address for a law firm and stamped it as legal mail so it would be subject to less inspection by

Bureau of Prisons (BOP) officials. BOP records indicate that letter was received by **JONES** on July 25, 2024, at USP Atwater.

16.    On July 26, 2024, **JONES** called **FERREIRA** on a recorded prison line and confirmed receipt of the letter mailed July 19. Using coded language, **JONES** instructed **FERREIRA** to have **RUDD** send more narcotics-laced mail and discussed profit sharing from narcotics sales with **FERREIRA**.

17.    On August 2, 2024, **JONES** placed a call on a recorded prison line to **FERREIRA** where they discussed **FERREIRA** meeting with **RUDD**.

18.    On August 6, 2024, **JONES** placed an additional call on a recorded prison line to **FERREIRA.** During the call **FERREIRA** informed **JONES** using coded language that **RUDD** had sent an additional narcotics-laced letter.

19.    On August 6, 2024, **RUDD** was observed on USPS surveillance cameras going to the same Wentzville, MO post office as on July 19 and mailing a letter to **JONES** at USP Atwater. USPS and BOP records show that certified letter was also stamped legal mail and had the same law firm return address.

20.    On August 9, 2024, the letter mailed August 6 was received at USP Atwater. A correctional officer, M.F., opened the letter in front of **JONES** at 11:36 A.M. M.F. came into contact with five pieces of "wet" or "waxy" paper inside the envelope and handed it to a co-worker, K.P. Within minutes, M.F. and K.P. both began to feel unwell. M.F.'s symptoms were more serious; medical was called for M.F. at 11:50 A.M., and he was transported to a nearby hospital at 12:21 P.M. M.F. passed away at 2:14 P.M.

21.    The letter mailed August 6, 2024, by **RUDD,** at **FERREIRA** and **JONES**'s direction, was tested for narcotics. It tested presumptively positive for amphetamines, fentanyl, and "spice", or synthetic cannabinoids, among other substances.

22.    Following an autopsy, M.F.'s cause of death remains undetermined pending toxicology reports. No obvious physical cause of death separate from narcotics was observed.

### III.    DEFENDANTS

23.    **Jamar JONES aka "Gutta Gambino" (JONES)** is a USP Atwater inmate who is

serving a sentence for a narcotics distribution offense. **JONES** has had several incidents/investigations while incarcerated in USP Atwater, FCI Mendota, and other federal prison facilities related to narcotics. **JONES'** criminal history includes a 2007 arrest for marijuana possession and sales, a 2008 arrest for attempted murder with a firearm, a 2012 arrest for possession of cocaine, a 2013 federal felony conviction for the sale of marijuana with a foreign origin, and a 2020 federal felony conviction for conspiracy to distribute methamphetamine. As discussed more fully below, based on the review of prison phone calls and prison email communications, I believe **JONES** planned, conspired, received, and attempted to receive controlled substances into USP Atwater via the United States Postal Service (USPS), specifically a piece of narcotics-laced "legal mail" that was addressed to **JONES** and arrived at USP Atwater on August 9, 2024.

24.     **Stephanie FERREIRA** (**FERREIRA**) is the un-incarcerated "girlfriend" of **JONES**. **FERREIRA's** criminal history includes a 2002 conviction for contempt of court and a 2008 conviction for conversion (theft under $100,000). As discussed more fully below, based on the review of prison phone calls and prison email communications, I believe **FERREIRA** assisted **JONES** in the planning, conspiring, and delivery of controlled substances into FCI Mendota and USP Atwater via the United States Postal Service (USPS), specifically a piece of narcotics-laced "legal mail" that was addressed to **JONES** and arrived at USP Atwater on August 9, 2024.

25.     **Jermen RUDD III, aka "Jay"** (**RUDD**) is an associate of **JONES** and **FERREIRA** who previously served a federal prison sentence for narcotics distribution; however, is currently un-incarcerated. **RUDD's** criminal history includes 2007 convictions for tampering with property and resisting arrest, 2009 convictions for a felony involving a motor vehicle and felony theft, a 2010 conviction for felon in possession of a firearm, a 2013 federal felony conviction for possession with intent to distribute heroin, and 2014 convictions for stealing of a motor vehicle and for the manufacture/distribution of a controlled substance. As discussed more fully below, based on the review of prison phone calls and prison email communications, I believe **RUDD** assisted **FERREIRA** and **JONES** in the planning, conspiring, and delivery of controlled substances into USP Atwater via the United States Postal Service (USPS), specifically a piece of narcotics-laced "legal mail" that was addressed to **JONES** and arrived at USP Atwater on August 9, 2024. In addition, I believe **RUDD** was

1   responsible for producing/lacing the "legal mail" with the controlled substances and mailing the letter

2   via USPS.

3   **IV.   PROBABLE CAUSE**

4

5   **A.   M.F. handles "legal mail" saturated with narcotics, becomes ill, and dies.**

6   26.   On August 9, 2024, USP Atwater Correctional Officers J.G., K.P., and M.F.  were

7   working in the mailroom sorting and distributing inmate mail. Shortly before noon, Correctional Officer

8   M.F. handled a piece of "legal mail" addressed from the Law Office of Douglas Richards, 9666 Olive

9   Blvd, St. Louis, MO 63132, to Jamar **JONES** 11003-028 at USP Atwater. M.F. called down inmate

10  **JONES** who arrived at the mailroom window shortly thereafter. **JONES** signed a logbook to retrieve

11  the mail and M.F. opened the letter in the presence of **JONES** at 11:36 AM, using a letter opener.  Once

12  M.F. opened the envelope and took out the pages, M.F. told inmate **JONES** that he could not have the

13  mail. M.F. then asked one of the other Correctional Officers, K.P., to look at the mail and K.P. stated

14  that the pages appeared "soaked." K.P. said that she could see print through all the pages, and it looked

15  like the pages were dipped in wax.  K.P. stated that in her experience, she believed that the mail was

16  coated with narcotics. K.P. informed the investigative team that she estimated that USP Atwater

17  detected suspected narcotics hidden within the mail approximately once per week.  K.P., who was

18  wearing "thin" gloves, then took the pages from M.F. and made a photocopy of each page and the

19  envelope. K.P. gave the copies back to M.F. for review and then put the "soaked" pages back into the

20  original envelope and into a plastic bag.  K.P. gave the plastic bag containing the "soaked" mail to M.F.

21  who then put the bag down on a cart in the office.

22  27.   M.F. then told K.P. that he should wash his hands. M.F. went to the bathroom by the

23  mail room and returned a short time later. M.F. retrieved the photocopies of the letter and gave them to

24  inmate **JONES**. K.P. said that when M.F. gave inmate **JONES** the copies, she heard **JONES** say, "the

25  envelope can be photocopied, but I need my original papers." K.P. said that M.F. replied, "No I'm not

26  giving them to you. They need to go to SIS[1] to be tested."  K.P. said that inmate **JONES** then said, "No

27

28  _____
    [1] Bureau of Prisons Special Investigative Services, or SIS, investigates matters including the introduction of
    narcotics to federal correctional facilities.

1   I need my fucking originals." M.F. again declined to return the original papers to **JONES** and **JONES**

2   left the area.

3       28.    Approximately five minutes after M.F.'s interaction with **JONES** and the "legal mail,"

4   K.P. observed M.F. start stumbling and not acting normal. K.P. stated that around the same time, she

5   also began feeling "weird." K.P. said that she felt "drowsy," her head was "spinning," and it was "hard

6   to breathe." K.P. said that M.F. put his left hand on the mail room door for support, and his right hand

7   was hanging down. K.P. recalled that M.F. said, "I don't feel good, it's going up my arm, I need

8   medical." K.P. said that M.F. continued to lean on the door with his left hand for support and said, "I

9   need medical right now." K.P. said she then used her radio to call for medical help. At approximately

10  11:50 AM, other BOP officers called for an EMT to evaluate M.F. The EMT arrived at approximately

11  12:00 PM and an ambulance was called at 12:06 PM. The ambulance arrived at approximately 12:21

12  PM and M.F. was transported to Emmanuel Hospital in Turlock, California. While enroute to the

13  hospital, M.F. coded and the paramedics began CPR. At 2: 14 PM, CO M.F. passed away.

14      29.    At approximately 12:26 PM, SIS staff conducted a test of the "legal mail" using the

15  Smith Detection ION Screen (ION Mobility Spectroscopy). The test revealed that the paper contained

16  various amounts of contraband substances including, but not limited to amphetamine[2], BGD,

17  Nicotinamide, "Spice"[3], and Furanylfentanyl. Furanylfentanyl is an opioid analgesic that is an analog of

18  fentanyl and is a Schedule II controlled substance.

19      30.    On August 14, 2024, an autopsy was performed of M.F. at the Merced County Coroner's

20  Office. The medical examiner did not observe an obvious cause of death from physical examination

21  alone and the cause of death determination remains pending toxicology results.

22      **B.**    **JONES and FERREIRA discuss smuggling drugs into a prison on July 13, 2024.**

23      31.    On July 13, 2024, **JONES** utilized the prison phone account of Inmate Sean Rivers, aka:

24  "Oso" (hereinafter RIVERS) to place a phone call to **FERREIRA** at her cell phone number of 812-568-

---

[2] According to BOP experts, a positive test for amphetamines using their devices is indicative of the presence of methamphetamine. Methamphetamine is the type of amphetamine used in the majority of prison introduced narcotics incidents.

[3] "Spice", or K2, is a synthetic cannabinoid which is a Schedule I controlled substance.

1189[4]. After RIVERS dialed the number and identified himself as "Oso" to the automated prison call system, he handed off the phone to **JONES**. When **FERREIRA** answered the phone, she referred to **JONES** as "baby." Later in the phone call **FERREIRA** referred to herself as "Stephanie."

32.     **JONES** stated to **FERREIRA**, "Please tell me you didn't send that dude no money, did you?" **FERREIRA** responded, "I did. You told me to." **JONES** continued, "Yeah, that nigga jacked me man." **FERREIRA** explained to **JONES** that she had spoken to the guy and that he had told her that he intended on sending the money back to **JONES**. Later in the call **FERREIRA** informed **JONES**, "Shy Boy[5] (hereinafter POWELL) is calling me now."  **JONES** asked for her to join POWELL into the call. **JONES** and POWELL greeted and then proceeded to discuss a prior failed plan, where POWELL was supposed to hand off narcotics to **JONES** who was in the Special Housing Unit (SHU) at FCI Mendota at that time. POWELL explained that before he could make it back to the SHU to get the narcotics to **JONES**, the FCI Mendota staff had pulled **JONES** from the SHU in order to transfer him to USP Atwater. (BOP records confirm that **JONES** was transferred from FCI Mendota to USP Atwater because he was suspected of introducing drugs into FCI Mendota).

33.     During the July 13 call, POWELL stated that he "had just grabbed everything because they shut the yard down the night before. The money had already been gone.  POWELL went on to explain that he "went back to Gino[6] (hereinafter LITTLES). I took him everything back and I'm like, 'hey can you just send the money back to Bros?'" POWELL explained that LITTLE said he would return the money to **JONES**; however, since LITTLE had not returned the money to **JONES** after several days, POWELL told LITTLE, "I need to get this back to Bros ASAP, so just go ahead and give me everything back and I'm going to go ahead and flip this. As it stands, I will have the 300 back to you by Tuesday." POWELL explained that "the rest of what he has to give me, I'm going to go get it right now at dinner and I already have it gone." POWELL told **JONES** that he "had 15 of them mutha fuckers for you too." POWELL continued, "So what he put together, and what I gave back to him, and then what

---

[4] Phone number 812-568-1189 is an AT&T number that lists Stephanie FERREIRA as the Financially Liable Party, the Billing Party, and the User. It lists the address of 322 Shamrock Ct., Evansville, IN (the **Target Residence**) associated with the billing and 2615 Poppy Hills Dr., Evansville, IN associated with the User.

[5] Federal Correction Institution (FCI) Mendota staff identified "Shy Boy" as Aaron POWELL.

[6] FCI Mendota staff identified "Gino" as Gino LITTLES 50456-039.

he brought back to me, it wasn't even the same shit bro. What he put together at first, it was a lookout. You know what I'm saying? There was some of all three in there. Some of the colored... some of the colored, some of the... the non-colored, you know what I'm saying? And, and, and then the... you know what I'm saying, the thangs." POWELL added, "I went to go give it back to him, and then whenever I told him like 'hey, just, just let me get it back. I'll go ahead and make the money.' You know what I'm saying? He brought it back to me in increments." Upon the conclusion of the three-way phone call, POWELL said his goodbyes to **JONES** and thanked "Stephanie." **FERREIRA** told POWELL, "You're welcome."

34.    Based on my training and experience, knowledge of this investigation, and review of numerous related prison phone calls and messages, I believe that **JONES** wanted to know if **FERREIRA** had already sent POWELL money, because **JONES** believed that POWELL stole the money that he was having sent to POWELL in exchange for the delivery of narcotics. When POWELL stated he had "grabbed everything," I believe he was informing **JONES** that he had picked up the narcotics from LITTLES. When POWELL added, "The money was already sent," I believe that he was informing **JONES** that the money for the payment of the narcotics that **JONES** had **FERREIRA** send to POWELL had already been given to the source of supply of those narcotics (LITTLES). POWELL explained to **JONES** that he was delayed in delivering the narcotics to **JONES** in the SHU because the prison yard that POWELL was housed in had been placed on lock down the night before. When POWELL informed **JONES** that he "took him everything back," I believe he was telling **JONES** that he returned the narcotics that he had received from LITTLE back to LITTLE since POWELL was unable to deliver the narcotics to **JONES** as planned. POWELL explained that LITTLE had said he would return the narcotics money to **JONES**, but that LITTLE never actually did that. Because of that, POWELL stated "I need to get this back to Bros ASAP, so just go ahead and give me everything back and I'm going to go ahead and flip this." By that comment, I know that POWELL asked LITTLE to get the narcotics back so that POWELL could sell them himself to make the money he needed to return to **JONES**. When POWELL told **JONES** that he "had 15 of them mutha fuckers for you too," I believe POWELL was indicating that he had been in possession of 15 pieces or units of the unknown narcotic(s) to deliver to **JONES**. POWELL indicated that he had three different types of narcotics, "the colored,"

"the non-colored," and the "thangs."

35.     Less than an hour following the above call, **JONES** again utilized the prison phone account of RIVERS to place a phone call to **FERREIRA** at her cell phone number of 812-568-1189. After RIVERS dialed the number and identified himself as "Oso" to the automated prison call system, he handed off the phone to **JONES**.

36.     **JONES** stated, "Man I would have had 70 bands if that nigga (POWELL) would have made it back on time." **FERREIRA** asked **JONES**, "Baby, you remember Jay the music producer?" **JONES** affirmed. **FERREIRA** continued, "You know what I'm getting to, from the loop?" **JONES** affirmed. **FERREIRA** continued, "Alright, you remember how his daughter got shot in the head? He back and running. He told me to hit him." **JONES** replied, "Okay, well you need to hit him." **FERREIRA** stated, "I already did. I told him when I got back in town, uh, but, he's gonna need a new... He's gonna need uh, uh... a new demonstration." **JONES** replied, "Yeah, but you gotta... you gotta book it though. You gotta book the flight. You got to. It's the only way. You gotta book it. You can't drive or none of that. You heard me?" **FERREIRA** affirmed. **JONES** continued, "... I'm gonna let you just take care of that." **JONES** went on to tell **FERREIRA**, "Listen, baby you need to call Jay immediately."

37.     Based on my training and experience, knowledge of this investigation, conversation with other agents, and review of numerous related prison phone calls and messages, I know that "band" is a slang term used to represent $1000. So, when **JONES** stated that he would have had "70 bands if that nigga would have made it back on time," I know he was stating that if POWELL would have successfully gotten the narcotics back to **JONES** in the SHU, **JONES** would have been able to make $70,000 from the sale of those narcotics. When **FERREIRA** asked **JONES** if he "remember Jay the music producer?" and then referenced that he was "from the loop," I believe that "the loop" was referring to the Delmar Loop area of St. Louis, MO, known for its entertainment and restaurants. When **FERREIRA** stated that Jay was "back and running," I believe she was informing **JONES** that Jay was back to operating a narcotics business. After **JONES** stated that **FERREIRA** should call Jay, **FERREIRA** stated that she already had. **FERREIRA** then informed **JONES** that Jay had told her that he would need "a new demonstration." From speaking with USP Atwater SIS staff and from listening to numerous other prison phone calls between **JONES** and others, I believe that "demonstration" is a term

1  used at USP Atwater to refer the method of narcotics introduction and/or method of sending or receiving

2  narcotics payments. In this instance, I believe that **FERREIRA** was possibly informing **JONES** that Jay

3  would need a new means of sending the narcotics or receiving payment for the narcotics. When **JONES**

4  told **FERREIRA**, "You gotta book the flight… You can't drive or none of that," I believe that **JONES**

5  was using coded language to instruct **FERREIRA** to send the narcotics through the mail as opposed as

6  delivering it in person during visitation. **JONES** indicated he would let **FERREIRA** "take care of that,"

7  but add that she needed to call Jay immediately.

8      38.   As described further in Section IV.H, based on my training, experience, and knowledge

9  of this investigation I believe "Jay" is Jermen **RUDD**. Among the evidence supporting this conclusion is

10  that **RUDD**'s mother posted on a social media account in August 2024 that her granddaughter (**RUDD**'s

11  daughter) had been shot in the head a year earlier, corroborating **JONES's** description of "Jay" to

12  **FERREIRA**.

13      **C.   JONES and FERREIRA again discuss smuggling drugs into prison; JONES then**

14      **receives a piece of "legal mail."**

15      39.   On July 15, 2024, **JONES** utilized the prison phone account of Inmate RIVERS Sean to

16  place a phone call to **FERREIRA** at her cell phone number of 812-568-1189. After RIVERS dialed the

17  number and identified himself as "Oso" to the automated prison call system, he handed off the phone to

18  **JONES**.

19      40.   During the phone call **FERREIRA** informed **JONES**, "So, um, Jay… I talked to him.

20  Um, the only thing I can do with him is six for two, and I'm gonna tell you this now. I, I'm coming out

21  of [UI] here lately. Like, I might have to slow down a minute. But I'm gonna do this." **JONES** asked

22  **FERREIRA**, "What you talking about? 200 dollars?" **FERREIRA** replied, "600 hundred for two."

23  Based on my training and experience, knowledge of this investigation, and review of numerous related

24  prison phone calls and messages, I believe when **FERREIRA** told **JONES** that "Jay" could do "six for

25  two," she was informing **JONES** that Jay would charge $600 for two units/pieces/pages of narcotics.

26  When **JONES** asked if it was for "200 dollars?" **FERREIRA** clarified that it was "600 for two."

27      41.   During the July 15 conversation, **FERREIRA** then asked **JONES**, about a "face card" or

28  "license plate" demonstration. **JONES** did not understand, and FEREIRA had to repeat "License plate

for car! The face card! License plate, to get the cars on the road!" When **JONES** indicated that he now understood what **FERREIRA** meant, **JONES** asked **FERREIRA**, "Why didn't you just say the cars? Why didn't you just say, 'Did you put... did you sell the cars in my name?' Why you... why you acting so crazy?" **JONES** continued, "That's cool. Just, uh... I just got to get the... I'm gonna have to get the plates switched over before, before we sell any... I only got, uh, probably like three old-school's left, but, the rest of the cars is in... some of them is in Zay's name, but yeah my name is... my name is cool. They, they still on the titles and all that." **FERREIRA** replied, "Okay, well so then... I'm gonna just get... I'm gonna just get the old-school out then."

42.     Based on my training and experience, knowledge of this investigation, and review of numerous related prison phone calls and messages, I believe **FERREIRA** was asking in coded language if the narcotics-saturated legal mail should be addressed to **JONES** at USP Atwater. FEREIRA's attempt to clarify ("License plate, demonstration, face card, is it for my man?!") prompted **JONES** to correct her use of coded language, which confirms that the subject of the conversation was addressing a package to **JONES** ("in his name"): "Why didn't you just say, 'Did you put... did you sell the cars in my name?'" When **JONES** informed **FERREIRA** that he would "have to get the plates switched over before, before we sell any... I only got, uh, probably like three old-school's left, but, the rest of the cars is in... some of them is in Zay's name, but yeah my name is... my name is cool…" I believe that **JONES** was informing **FERREIRA** that he would need to receive the narcotics-saturated mail before he could sell substantial quantities of narcotics as he only had about "three old-schools left." I believe that "old-school" is a term that **JONES** was using to reference a certain narcotic that had been around for a longer period of time within the BOP system, compared to other narcotics that he was also selling. He then confirmed that sending the letter in his name was okay.

43.     Later in the July 15 conversation, **JONES** asked **FERREIRA**, "If I told you you had to book the flight, what is Jay talking about?" **FERREIRA** explained, "Because he was trying to ask me if it was under you or not." **JONES** continued, "I said he gotta book the flight. What do you need... what do you need from me?" **FERREIRA** affirmed that she understood but added that she just wanted to make sure. **JONES** clarified, "So did he say he can help you... Did he say he can help you book the flight or what did he say?" **FERREIRA** replied, "Of course, he did say it." **JONES** continued, "I don't

understand why you went all the way there with Jay. Why you just didn't meet him halfway just to see what was up first?" When **FERREIRA** started the respond, **JONES** cut her off and continued, "Stephanie listen, listen. What I'm saying is see how your trip go first before you commit to keep coming. That's what I'm trying to tell you." **FERREIRA** replied, "I've already got one. I've already seen one. You understand?" **JONES** said, "Why would you jump out there... Why would you jump out there and get a round trip for two tickets, there and back, and it's like you don't even know if, if... you know what I'm saying?" **FERREIRA** responded, "Because it's five for one, or two... for, uh or, for two it's three each. So, what are we doing?" **JONES** just told **FERREIRA** to make sure she had it all figured out on her end. The conversation continued and **JONES** added, "This is a long trip man. This is. That's a four-hour flight man, like..." **JONES** explained that **FERREIRA** needed to be safe and not have a "bad trip" as it would be a waste of time and money."

44. When **JONES** asked **FERREIRA**, "If I told you you had to book the flight, what is Jay talking about?" I believe based on my training, experience, and knowledge of the investigation that he was asking why, given that he had directed **FERREIRA** to send the narcotics mail, **RUDD** had not yet sent it. **FERREIRA**'s response indicated that the delay was based on not knowing whether to put **JONES**' name on the package. **JONES**' questions about why FEREIRA was involved in "trip(s)" before "seeing what was up" were asking **FERREIRA** why she would commit to sending a large amount of the narcotics-saturated mail from the start without doing a smaller test mailing at first to ensure that the mail would make it past USP Atwater staff and successfully to **JONES**. **FERREIRA**'s response was: "Because it's five for one, or two... for, uh or, for two it's three each. So, what are we doing?" By this comment I know that **FERREIRA** was explaining that one unit/piece/page of the narcotics cost $500, but that she could get double that amount for only $100 more ($600). **JONES** concluded by saying, "This is a long trip man. This is. That's a four-hour flight…," meaning that they were sending a large amount of narcotics. **JONES** then directed **FERREIRA** to be safe so that she wouldn't have a "bad flight" (get the narcotics mail seized).

45. According to the USP Atwater legal mail logbook[7], **JONES** received "legal mail" on July

---

[7] The logbook contains the date and time legal mail was received by USP Atwater staff, the inmates name and registration number that it was addressed to, the sender's name and return address, the date and time the mail was delivered

25, 2024, with the sender address listed as Law Offices of Douglas Richards, 9666 Olive Blvd, St. Louis, MO. The logbook reflects that the mail was delivered to **JONES** at 11:43 a.m. that morning and that **JONES** had signed for it. This was the same sender name and address as the "legal mail" received on August 9, 2024, that tested presumptively positive for Furanylfentanyl and appeared to lead to the medical emergency and death of M.F.

**D.    The day after JONES receives "legal mail," he and FERREIRA discuss receiving narcotics, as well as payment and future shipments involving RUDD.**

46.    On July 26, 2024, the day after he received the purported "legal mail," **JONES** utilized the prison phone account of Inmate James Moon 49007-044 (hereinafter MOON) to place a phone call to **FERREIRA** at cell phone number 812-463-3681.  A male (believed to be **JONES**) can be heard providing the caller with the phone number to dial. The male caller identified himself as "James MOON" to the automatic prison call system and then handed the phone off to **JONES**.

47.    During the call **JONES** told **FERREIRA**, "Make sure you holler at Jay. Tell him, tell him four times man. I, I, I fucked up, man. I didn't know the watchacallit was one, man. I, I, I accidentally, man, got rid of that one fucker. On that, yeah, I didn't know, but tell him next... tell him four times time. Perfect. Exact same. It was perfect." **FERREIRA** affirmed and **JONES** continued, "every time it's going to be the same, the same, same, same, uh, demonstration." **JONES** added, "It's gravy. That's what I said. It's gonna be... I'm, I'm, I'm  gonna have like, probably like, like 15, 20  for you in a second." **FERREIRA** explained that the CashApp is "just raymoney and then 812 and then his name is at the bottom. It got a picture of him and he's, um, sitting on top of his car."

48.    Based on my training and experience, knowledge of this investigation, and review of numerous related prison phone calls and messages, I believe when **JONES** told **FERREIRA** to contact Jay and to "tell him four times," he was directing **FERREIRA** to order four more units/pieces/sheets of narcotics to be mailed into USP Atwater by **RUDD**. When **JONES** added, "I fucked up, man. I didn't know the watchacallit was one, man. I, I, I accidentally, man, got rid of that one fucker," I believe he was informing **FERREIRA** that he had already received the narcotics-saturated "legal mail" that

---

to the inmate, and the signature of the inmate who received the mail.

RUDD had sent, but that **JONES** inadvertently disposed of it, not knowing that it was the narcotics. **JONES** went on to tell **FERREIRA** to tell Jay to do it again the "exact same," and that "it was perfect." **JONES** added, "every time it's going to be the same, the same, same, same, uh, demonstration." By this comment, I believe that **JONES** was letting **FERREIRA** know that they could send the mail from the same law office every time going forward. **JONES** than bragged that it would be easy and that he was "gonna have like, probably like, like 15, 20 for [**FERREIRA**] in a second." I believe that **JONES** was informing **FERREIRA** that he believed he would be able to give her $15,000 or $20,000 from the sale of the narcotics in a short amount of time.

49.     Based on the timing of the above phone call on July 26, 2024, the following day after receiving the first "legal mail" from the Law Offices of Douglas Richards on July 25, 2024, I believe that a narcotics-saturated letter was put together and mailed by **RUDD**, and previously planned and organized by **JONES** and **FERREIRA**. I also believe that **JONES** was referencing that letter when he informed **FERREIRA** that he had "fucked up" and "accidentally got rid of that…"

50.     During an August 9, 2024, interview of **JONES**, **JONES** admitted to the interviewers that he had previously received legal mail from the Law Offices of Douglas Richards and claimed that he just threw it in his "locker." To date, this letter has not been located.

**E.     JONES and FERREIRA plan another mailing of narcotics in early August 2024.**

51.     On August 2, 2024, **JONES** utilized the prison phone account of Inmate Joshua Gilpin 32569-509 to place a phone call to **FERREIRA** at cell phone number 812-271-6861. The male caller identified himself as "Joshua GILPIN" to the automatic prison call system and then handed the phone off to **JONES**.

52.     During the phone call **JONES** asked **FERREIRA**, "What Jay talking about? Soon?" **FERREIRA** replied, "Yes, just um, he's um, coming into town. But um, yes, this week." By that comment I believe that **FERREIRA** was planning to meet with **RUDD** in Evansville, IN and send the narcotics-soaked "legal mail" sometime within the next week.

53.     On August 6, 2024, **JONES** utilized the prison phone account of Inmate Jajuan Hunt 21811-509 (hereinafter HUNT) to place a phone call to **FERREIRA** at cell phone number 812-271-6861. The male caller identified himself as "Man Man" to the automatic prison call system and then

handed the phone off to **JONES**.

54.    During the call **JONES** asked **FERREIRA**, "What was Jay talking about?" **FERREIRA** replied, "Uh, he got gone today." When **JONES** confirmed, "Oh, okay. He left?" **FERREIRA** said, "I just got done, um, seeing him, um, like about a hour ago."

55.    Based on my training and experience, knowledge of this investigation, and review of numerous related prison phone calls and messages, I believe when **JONES** asked, "What was Jay talking about?" I believe he was inquiring with **FERREIRA** if Jay had mailed the narcotics yet. When **FERREIRA** said, "he got gone today," I believe she was letting **JONES** know that the narcotics were sent out in the mail. When **FERREIRA** added that she had just got done "seeing him, um, like about a hour ago," I believe she was indicating that the mail was sent out about an hour earlier.

**F.**    **U.S. Postal Service records indicate that RUDD collaborated with FERREIRA to mail the August 9 "legal mail" package to JONES.**

56.    The investigative team in this case includes United States Postal Inspection Service (USPIS), which possesses the ability to track certified mail and records associated with such mail. Postal Inspectors reviewed postal records and photographs of the narcotics-saturated "legal mail" that was addressed to **JONES** and arrived at USP Atwater on August 9, 2024. From their review of those records, that letter was sent from the United States Post Office located at 762 Luetkenhaus Blvd, Wentzville, MO 63385 on August 6, 2024, at approximately 1:30 p.m. The certified letter was mailed Priority and was assigned tracking number 9589071052700396312371. These records support my conclusion that the above phone call from August 6, 2024, at approximately 2:53 p.m. involved FEREIRA telling **JONES** that **RUDD** had mailed narcotics when she said that "Jay had 'got gone today." **FERREIRA** added that she had just got done seeing Jay about an hour earlier, which in consistent with USPIS records for the time the letter was mailed.

57.    A review of USPS business records by USPIS revealed that a USPS customer account for the name Stephanie **FERREIRA** was created on May 20, 2022, at 11:41 a.m. The account number is 319167917, and the screen name for the account is Lilmama026. The address listed for the account is 322 SHAMROCK CT EVANSVILLE, IN 47715-3285, phone number (812) 455-3789, and email stephanief758@gmail.com. The customer account number was assigned by the USPS but the addresses,

name, email, phone number and screen name are made up by the customer.

58.     The investigative team confirmed that the 322 Shamrock Court address is listed as **FERREIRA's** address on her drivers license and in commercial databases. Cellular ping data authorized on phone number (812) 455-3789 by U.S. Magistrate Judge Erica P. Grosjean on August 11, 2024 further shows the phone associated with that phone number to be consistently present at that address. Finally, apartment complex employees confirmed that **FERREIRA** is the resident at that address on August 15, 2024.

59.     Specific to this investigation, the above-referenced USPS customer account was accessed on August 9, 2024, at 05:30 a.m. with unique IP 2600:387:15:3210::5. That same unique IP was used to track package 9589071052700396312371 on August 9, 2024, at 3:39 p.m. That tracking number was associated with the narcotics-saturated "legal mail" that **RUDD** mailed on August 6, 2024, and arrived at USP Atwater on August 9, 2024. Additionally, the unique portion of IPV6 2600:381:c289:45e9:d4f3:2a96:1a98:51b7 (the first four octets) was used to logon to the customer account on July 24, 2024, at 05:26 a.m. and to track USPS package 9589 0710 5270 0396 3111 07, which would have been associated with the "legal mail" that was mailed on July 19, 2024, and arrived at USP Atwater on July 25, 2024. From my training and experience, and conversation with USPIS investigators, in general, the first four octets of an IPV6, such as this one, are unique to a device with internet access such as a cell phone. The last four octets change, however, the first four stay the same specific to the device.

G.     **JONES, after seeing the August 9 "legal mail," tells FERREIRA something was wrong with it.**

60.     On August 9, 2024, at approximately 12:12 p.m. (immediately following **JONES** going to the mailroom to receive the "legal mail' in question), **JONES** sent **FERREIRA** a message to her cell phone number 812-271-6861 using Inmate Cornelius Bennett's (hereinafter BENNETT) USP Atwater TRULINCS messaging service account. TRULINCS is a messaging service used by BOP, where Inmates can compose and send emails to an un-incarcerated person, who in-turn receives the email message as a text message on their phone. The TRULINCS message read: "*u kno i would.ppl had to give Jay a test bc he looked crazy.idk wats goin on.get w him on 2 today & hve him do it asap.tell him tighten*

*up.idk if im coo or wat.he was lookin super crazy.if i dnt hit u u kno wassup.waitn to hear back from ppl."*

61.     Based on my training and experience, knowledge of this investigation, and review of numerous related prison phone calls and messages, I believe when **JONES** stated "*ppl had to give Jay a test bc he looked crazy*," he was letting **FERREIRA** know that the USP Atwater staff tested the "legal mail" letter for narcotics because it looked suspicious (saturated). When **JONES** added, "*get w him on 2 today & hve him do it asap,*" I believe that he was directing **FERREIRA** to get ahold of Jay that day so that Jay could put together two more units/pieces/pages of narcotics-saturated "legal mail" and to get it in the mail as soon as possible. When **JONES** told **FERREIRA** to "*tell him tighten up,*" I believe he was directing her to instruct Jay to do a better job at soaking the narcotics into the letters, as they were "*lookin super crazy.*"

**H.     Surveillance video and photographs confirm that RUDD mailed the narcotics-laced August 9 "legal mail" package to USP Atwater as well as the earlier "legal mail" package.**

62.     USPIS obtained and provided FBI with still shots and surveillance videos from both the July 19, 2024, mailing of the "legal mail" addressed to **JONES** that arrived at USP Atwater on July 25, 2024, and the August 6, 2024 mailing of the "legal mail" addressed to **JONES** that arrived at USP Atwater on August 9, 2024. The cameras covered the post office counter where the mailer and the clerk would conduct a mail transaction. The sender on both letters was listed as the Law Offices of Douglas Richards, and both letters were mailed certified Priority mail from the USPO in Wentzville, MO. After reviewing the surveillance video from both mailings, it was clear that the mailer from both occasions was the same person. The mailer was a black adult male with long dreadlocks, diamond earrings, and glasses. USPIS obtained a screenshot of the mailer's face from the August 6, 2024, surveillance video and submitted that image into a law enforcement facial recognition program. One of the potential matches returned from the facial recognition analysis was a photo of Jermen **RUDD** from a social media account. Based on those findings, the investigative team obtained additional social media, DMV, and booking photos of **RUDD** that they used to compare to the USPS surveillance camera footage. Based on these comparisons, the investigative team determined that the individual captured by the USPS surveillance cameras on both July 19, 2024, and August 6, 2024, was indeed **RUDD**. One of the social

media accounts was **RUDD**'s Facebook account in the name "Jermen Notez," described below.

63.    Because **FERREIRA**, during a July 13 jail call with **JONES**, described "Jay" as a music producer from the loop who had a daughter who was shot in the head (as described above in Section IV.B), the investigative team conducted social media searches for **RUDD** and some of his family and friends.  The investigative team located a Facebook account for Cynthia **RUDD**.  On August 7, 2024, Cynthia posted on her page, "My Granddaughter Was Shot A Year Ago And Lost The Sight In One Of Her Eyes They Were Talking About Removing It I Thank GOD They Didn't And I Just Wanna Say I'm So Blessed And Grateful To Still Have Her Here And I Wanna Admire How Beautiful She Still Is Inside And Out I Love You Mya." On May 19, 2023, Cynthia posted on her Facebook page "My Granddaughter Was Shot Last Night… [THE POST CONTINUED]… Give My Son Jermen Notez And RoRo Bethune The Strength…" Based on this information, along with multiple social media posts by **RUDD** related to him being involved in music, I believe that this is further evidence that when **JONES** and **FERREIRA** discuss "Jay," they are referencing **RUDD**.  In addition, both the Jermyn Notez account and Cynthia **RUDD**'s account indicated they were from Blytheville, Arkansas.

**I.      License Plate Reader data further indicates that RUDD mailed both "legal mail" packages to USP Atwater**

64.    A member of the investigative team conducted a search for **RUDD**'s 2019 Ram bearing Missouri license plate number (1YGN10) within the License Plate Recognition (LPR) system, FLOCK. FLOCK is a database consisting of law enforcement cameras positioned throughout the Greater St. Louis, MO region that capture license plates of vehicles traveling on public roadways and highways. The search revealed that numerous FLOCK cameras captured **RUDD**'s Ram truck on multiple occasions throughout the St. Louis region in July and August of 2024. Specifically, on July 19, 2024, at approximately 4:22 p.m. CDT, a FLOCK camera captured the truck traveling east bound at Wentzville Parkway and W. Meyer Road in Wentzille, MO. This intersection is utilized to enter and exit the subdivision in which **RUDD**'s residence is located and is approximately one-half mile from the residence. A FLOCK camera then captured **RUDD**'s Ram at approximately 4:23 p.m. CDT, traveling east bound on Wentzville Parkway and Schroeder Creek Blvd., an intersection located on what would be a common path of travel from **RUDD**'s residence to the Wentzville Post Office. A FLOCK camera then

captured **RUDD**'s Ram at approximately 4:37 p.m. CDT, traveling westbound on Wentzville Parkway and Luetkenhaus Blvd., an intersection located approximately five hundred feet (500 ft.) from the Post Office.  This FLOCK capture was approximately three (3) minutes after the USPS video surveillance at the Post Office captured **RUDD** exiting the Post Office.  Additionally, the Westbound direction of travel of **RUDD**'s Ram at the 4:37 p.m. that FLOCK captured would indicate that **RUDD** was traveling away from the Post Office.  Lastly, a FLOCK camera captured the Ram truck at approximately 4:43 p.m. CST, traveling west bound on Wentzville Parkway and W. Meyer Rd., again at the entrance/exit of the subdivision in which **RUDD** resides.

65.    From my training, experience, and analysis of the evidence related to **RUDD**'s Ram truck and the USPS mailings, I believe the evidence supports the conclusion that **RUDD** mailed the "legal mail" addressed to **JONES** on July 19, 2024, and that the package arrived at USP Atwater on July 25, 2024.

66.    The same data corroborates the conclusion that **RUDD** mailed the "legal mail" sent on August 6 and received at USP Atwater on August 9.  The FLOCK database revealed a FLOCK camera captured **RUDD**'s Ram truck on August 6, 2024, at approximately 3:18 p.m. CDT, traveling east bound on Wentzville Parkway and W. Meyer Rd., the entrance/exit of the subdivision in which **RUDD** resides. A FLOCK camera then captured **RUDD**'s Ram at approximately 3:19 p.m. CDT, traveling east bound on Wentzville Parkway and Schroeder Creek Blvd.  Next, at approximately 4:09 p.m. CDT, a FLOCK camera captured the vehicle traveling on W. Florissant Ave. and Pershall Rd., St. Louis, MO. This intersection is approximately thirty-four (34) miles, or approximately thirty-five (35) minutes, from the Post Office where USPS video surveillance captured **RUDD** leaving at approximately 3:32 p.m. CDT.

67.    From my training, experience, and analysis of the evidence related to **RUDD**'s Ram truck and the USPS mailings, I believe the analysis is consistent with **RUDD** mailing the narcotics-saturated "legal mail" addressed to **JONES** at USP Atwater and which arrived on August 9, 2024.

68.    The investigative teams' search of the FLOCK database revealed a FLOCK camera captured **RUDD**'s Ram truck on August 6, 2024, at approximately 3:18 p.m. CST, traveling east bound on Wentzville Parkway and W. Meyer Rd., the entrance/exit of the subdivision in which **RUDD** resides. A FLOCK camera then captured **RUDD**'s Ram at approximately 3:19 p.m. CST, traveling east bound

on Wentzville Parkway and Schroeder Creek Blvd. Next, at approximately 4:09 p.m. CST, a FLOCK camera captured the vehicle traveling on W. Florissant Ave. and Pershall Rd., St. Louis, MO. This intersection is approximately thirty-four (34) miles, or approximately thirty-five (35) minutes, from the Post Office where USPS video surveillance captured **RUDD** leaving at approximately 3:32 p.m. CST.

69. From my training, experience, and analysis of the travel times and patterns of **RUDD**'s Ram truck revealed through FLOCK camera data, in comparison to the time the USPS video surveillance captured **RUDD** entering and exiting the Post Office on August 6, 2024, I believe the analysis is consistent with **RUDD** mailing the narcotics-saturated "legal mail" addressed to **JONES** at USP Atwater and which arrived on August 9, 2024. utilizing the Target Vehicle immediately before and to arrive at the Post Office from his residence.

**J.     RUDD  mailed another narcotics-laced letter on August 15, 2024 to a different address, further evidence of his knowledge of the contents of these letters**

70. On August 15, 2024, members of the investigative team conducted physical surveillance of **RUDD**. During surveillance, members of the investigative team observed **RUDD** drive a white 2019 Dodge Ram bearing Missouri license plate 1YGN10 to the Wentzville post office at approximately 2:30 PM. Members of the investigative team observed **RUDD** prepare a USPS Priority Mail Express envelope. Plainclothes agents were present inside the Post Office and observed **RUDD** consult with his phone before hand-writing the to/from address label on the package. **RUDD** handed the envelope to the clerk and completed the transaction by paying $30.45. The item was seized by the investigative team and a warrant to open it was issued by the Eastern District of Missouri. The sender name was "Roe," and the address was 8786 N. Creek Blvd, Bldg 20 apt 8, Southaven, MS, 83671. The recipient name was "John Shields," and the address was 8786 N. Creek Blvd Bldg 20 apt 8, Southaven, MS, 38671.

71. On August 16, 2024, members of the investigative team, pursuant to the Eastern District of Missouri search warrant, opened the letter observed what appeared to be papers coated in some unknown substance. The papers were swabbed, and the swabs were submitted for testing. A presumptive test revealed a K2 spice variant and synthetic cannabinoid were present. Further testing was ordered.

**V.     REQUEST FOR SEALING**

72. It is respectfully requested that this Court issue an order sealing, until further order of the

Court, all papers submitted in support of this application, including the complaint and affidavit. I believe that sealing this document is necessary because the records relate to an ongoing investigation that includes multiple targets who have not yet been apprehended. Premature disclosure of the contents of this affidavit and related documents may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness. Such a disclosure would give the targets an opportunity to notify confederates, change patterns of behavior and/or take steps to destroy evidence.

## VI.   CONCLUSION

73.     Based on the totality of facts set forth in this affidavit, I believe there is probable cause to believe that the defendants committed the following violations:

a)     **Jamar JONES** - conspiracy to distribute and possess with intent to distribute methamphetamine, in violation of Title 21, United States Code, Sections 846 and 841(a)(1); and any inmate of a federal prison who makes, possesses, or obtains any narcotic drug in violation of Title 18, United States Code, Sections 1791(a)(2), (b)(1).

b)     **Stephanie FERREIRA** – conspiracy to distribute and possess with intent to distribute controlled substances, in violation of Title 21, United States Code, Sections 846 and 841(a)(1); and provide to an inmate of a prison a narcotic drug, or attempts to do so in violation of Title 18, United States Code, Sections 1791(a)(1), (b)(1).

c)     **Jermen RUDD III** – conspiracy to distribute and possess with intent to distribute controlled substances, in violation of Title 21, United States Code, Sections 846 and 841(a)(1); and provide to an inmate of a prison a narcotic drug, or attempts to do so in violation of Title 18, United States Code, Sections 1791(a)(1), (b)(1).

74.     I respectfully request the issuance of arrest warrants for individuals listed above.

//

//

//

AFFIDAVIT IN SUPPORT OF COMPLAINT                25

1

2        I declare under penalty of perjury that the facts contained herein are true and correct to the best

3  of my knowledge and belief.

4                                _____

5                                Nathan Blevins, Special Agent
Federal Bureau of Investigation

6

7

8

9  Attested to by the applicant in accordance with

10  the requirements of Fed.R.Crim.P. 41.1, by internet

11  telephone on     8-18-2024                    .

12

13

14                       The Honorable Sheila K. Oberto
United States Magistrate Judge

15

16

17  Approved as to form and substance:

18  /s/  Robert Veneman-Hughes
Robert Veneman-Hughes

19  Assistant United States Attorney

20

21

22

23

24

25

26

27

28

AFFIDAVIT IN SUPPORT OF COMPLAINT     26